**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREYSON FREDERICK, | Civil Action |
| Plaintiff, | No.  2:23-cv-1177 |
| v. | |
| LITHIA MOTORS, INC. d/b/a BAIERL FORD, | JURY TRIAL DEMANDED |
| Defendant. | |

## CIVIL COMPLAINT

Plaintiff, Greyson Frederick by undersigned counsel, files this Civil Complaint, and in support states the following.

### I. Jurisdiction and Administrative Exhaustion

1. Plaintiff invokes this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2. Plaintiff has exhausted the administrative remedies set forth under the Americans with Disabilities Act, as follows:

   a. He timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination, having filed an Amended Charge on or about January 18, 2023, and cross-filed with the Pennsylvania Human Relations Commission ("PHRC");

   b. On or about April 5, 2023, the EEOC issued a Notice of Right to Sue; and

   c. Plaintiff filed this action within 90 days of receipt of that Notice.

### II. Parties

3. Plaintiff, Greyson Frederick, is an adult individual who resides in Industry, Beaver County, Pennsylvania.

4. Defendant, Lithia Motors, Inc., is a corporation with a principal place of business

located Medford, Oregon.

5.      Defendant is the parent company of the Pennsylvania corporation Northland Ford, Inc.

6.      Northland Ford, Inc. owns the registered fictitious name Baierl Ford, and operates a business called Baierl Ford, located at 540 S. Main Street, Zelienople, Butler County, Pennsylvania.

7.      After Plaintiff filed a charge of discrimination with the EEOC against Baeirl Ford, Defendant Lithia Motors, Inc. submitted a response to the charge, indicating that it had been Plaintiff's employer.

8.      In 2022, Defendant employed at least 15 employees in at least 20 weeks of the calendar year.

### III. Facts

**A.  Start of Mr. Frederick's Employment**

9.      On or about August 3, 2021, Mr. Frederick interviewed for a Commercial Fleet Technician position at Baierl Ford with Operations Manager Frank Smith and Service Writer Mike Brown.

10.     On behalf of Defendant, Mr. Smith offered, and Mr. Frederick accepted, a position of Commercial Fleet Technician at a "flat rate" of $30 per hour and a $20,000 sign-on bonus.

11.     Mr. Smith explained that Defendant would pay the $20,000 bonus at a rate of $2,000 per month.

12.     During Mr. Frederick's interview, Mr. Smith told Mr. Frederick that Commercial Fleet Technicians were allowed to do "side work" in the shop, such as working on one's own or a

family member's car. He further explained that Mr. Frederick would need a repair order to work on a family member's car, but would not need a repair order to work on his own car.

13. On or about August 23, 2021, Mr. Frederick began his first day of work.

14. That day, Mr. Smith told Mr. Frederick that his sign-on bonus would start in 30 days.

### B. Mr. Frederick's Early Employment

15. Defendant paid Mr. Frederick and others in his position a "flat rate" per task that preassigned an amount of time work was expected to take, rather than how long the work actually took. For example, an oil change is paid at 0.4 hours, or $12.

16. As a result, if a Commercial Fleet Technician had no work to do, he would not be paid while at work.

17. In November 2021, Josh Gagne replaced Mr. Smith as Operations Manager.

18. In or around January 2022, Mr. Gagne called a meeting with the Commercial Fleet Technicians, Lube Technicians, and Auto Technicians, and explained that if employees had all their work done, they could leave. He commented that there was no reason to be at work if they were not getting paid.

19. On or about January 19, 2022, General Manager Pat McIntyre commended Mr. Frederick on his high school Grade Point Average (GPA), and told him he was the type of tech the company was looking for. He further stated, "we are super pleased with you."

20. During the same discussion, Mr. McIntyre, Mr. Gagne, and Mr. Brown offered Mr. Frederick a shift of 8:00 am to 5:00 pm, as opposed to 7:30 am to 4:30 pm. Mr. Frederick accepted.

21. On or about January 22, 2022, Mr. McIntyre again commended Mr. Frederick on his GPA, and told him, "you are the archetype we are looking for here."

22. During this discussion, Mr. McIntyre and Mr. Frederick discussed high school. Mr. Frederick shared that he struggled in school despite his good grades because he had Attention Deficit Hyperactive Disorder (ADHD).

23. Mr. McIntyre became withdrawn following Mr. Frederick's disclosure of his ADHD.

C. **Mr. Frederick's Disabilities and Effects**

24. Mr. Frederick suffers from ADHD and Generalized Anxiety Disorder, obsessive type.

25. The above impairments substantially limit several major life activities, including sleeping and concentrating.

26. Mr. Frederick was prescribed Adderall to mitigate the effects of his ADHD.

27. In January 2022, Mr. Frederick's health insurance stopped covering the name brand Adderall, causing Mr. Frederick to switch to a generic version. Unfortunately, Mr. Frederick did not experience the same results with the generic version as he did with the name brand medication. It would take months of working with his doctor to get the dosage correct and return to the stability he had while on Adderall.

28. After his medication change, Mr. Frederick had great difficulty waking up in the morning.

29. Mr. Frederick's impairments also cause him to be easily distracted or forgetful, and result in general time management issues. When leaving the house in the morning, he often would feel compelled to make multiple trips back into the house to make sure he was not forgetting something.

30. As a result, he sometimes arrived at work after 8:00 am.

31. In late March or early April 2022, Mr. McIntyre told Mr. Frederick that Mr. Gagne wanted to write him up due to being late. Mr. Frederick explained that he had ADHD and struggled with time management. He also explained that after finally finding a medication dose that worked, insurance stopped covering it. He complained about generic medication, and said he was trying to find the correct dose again.

32. Mr. McIntyre responded that he took a generic medication too, and it was awful. However, "it's not that hard. You just get up and be here on time."

33. On or about April 11, 2022, Defendant suspended Mr. Frederick without pay for three days, and also suspended his receipt of the sign-on bonus he was promised at the start of his employment.

34. When Defendant offered the sign-on bonus, it never indicated that the eligibility for the bonus could be suspended or otherwise affected.

**D. Requests for Accommodation and Reactions**

35. On or about April 15, 2022, Mr. Frederick submitted a type-written request for an accommodation to Mr. McIntyre.

36. Mr. Frederick's accommodation request asked for a "flexible shift 8:00/8:30 to 5:00/5:30," and explained that it would "reasonably accommodate an employee who struggles with time management due to daily issues with ADHD and GAD (classified as obsessive type)."

37. Defendant did not respond to the above request for accommodation for one week.

38. On April 22, 2022, Mr. Gagne told Mr. Frederick that he received his letter, but his start time was 8:00 to 5:00.

39. A few minutes later, Mr. Frederick asked Mr. Gagne for leniency because he had medical reasons for being late.

40. Mr. Frederick also complained that he was being punished more severely than other people who arrived at the same time, or later than him. He told Mr. Gagne that this was disparate treatment and therefore discrimination.

41. Mr. Frederick also asked to have his bonus unsuspended.

42. Mr. Gagne said there was no agreement for Mr. Frederick to receive a bonus, and he had been receiving bonus payments "out of the goodness of [his] heart."

43. On or about April 25, 2022, Mr. Frederick was called into a meeting with Mr. Gagne and Mr. McIntyre.

44. Mr. McIntyre said that Mr. Frederick's "disparate treatment" comment a few days earlier made him feel like Mr. Frederick was "tying a noose around [his] neck and forcing [his] hand."

45. Mr. McIntyre and Mr. Gagne told Mr. Frederick that they would not accommodate him unless HR forced them to.

46. On or about April 28, 2022, Mr. Frederick spoke with Amber Baker in Human Resources regarding his request for accommodation.

47. After the call ended, Mr. Gagne and Mr. McIntyre told Mr. Frederick that they heard back from HR, and provided him accommodation paperwork to complete. They informed him that unless and until HR approved an accommodation, his shift was 8:00 to 5:00, and if he was late, he could be punished accordingly, up to and including termination.

48. On or about May 11, 2022, Mr. Frederick submitted the accommodation request to Defendant's third-party accommodation provider, Reed Group.

49. On or about May 20, 2022, an HR employee for Defendant informed Mr. Frederick that his accommodation request had been accepted.

50. Mr. Frederick asked the HR employee if he could leave prior to 5:30 pm if all of his work was done like everyone else could. The HR employee responded that as long as that was the rule for everyone, then yes, he could leave prior to 5:30.

51. On or about May 23, 2023, Mr. McIntyre and Mr. Gagne called Mr. Frederick into a meeting about his accommodation being granted.

52. Mr. Frederick asked if he would receive backpay for his sign-on bonus. They responded no, but that they would start paying it again on his next paycheck.

53. On May 26, 2022, ReedGroup issued Mr. Frederick a letter approving his accommodation request of "flexible start/end time. Work a full shift," effective April 29, 2022.

**E. Mr. Frederick's Termination**

54. On June 1, 2022, Mr. Gagne emailed Tiani Langston in Human Resources and the general Employee Relations email box claiming Mr. Frederick was "not holding up to his end of the working arrangement," in that "he has not been ready to work at 8:30 am with yesterday 5/31 being the worst (8:45 still not working), and that he was not working "the 9 hour schedule agreed upon."

55. Mr. Gagne further stated that Mr. Frederick "has become a cancer in the shop with his negative attitude and inability to properly complete his paperwork."

56. On June 3, Defendant fired Mr. Frederick.

57. During the termination meeting, Mr. Gagne told Mr. Frederick that his accommodation was "not working out," and also referenced Mr. Frederick working on his own car without a repair order.

58. In his termination letter, Defendant stated, "On multiple occasions in the last pay period, you did not work your full scheduled shifts. Further concerning, management witnessed

you on 6/1/2022 working on your personal, [sic] while on the clock and did not have an open RO on the vehicle."

59. Contrary to Mr. Gagne's allegations, during the pay period of May 16 through May 31, 2022, Mr. Frederick arrived at work every day before 8:30 am.

60. Mr. Frederick worked between 8.55 hours and 10.75 hours every day throughout this pay period.

61. The reference in Mr. Gagne's June 1 email to "still not working" at 8:45 on May 31 referred to Mr. Gagne seeing Mr. Frederick in the Service Writers' office discussing work for the day and filling up a bottle of water. Mr. Frederick clocked in for work at 8:21 am that day.

62. As noted above, Defendant permitted employees to work on their personal vehicles without a work order.

63. Defendant also permitted employees to leave when their work was done, given that they were paid by the job rather than salary or by the hour.

64. As of Mr. Frederick's termination, he had only received $14,000 of the $20,000 sign-on bonus that Defendant had agreed to pay him at the start of his employment.

**Count I**
**ADA: Discrimination**

65. Plaintiff incorporates the allegations of Paragraphs 1 through 64 as if fully restated.

66. Plaintiff was an individual with a disability because he suffered from an impairment that substantially limited him in major life activities.

67. Plaintiff also had a record of such impairment, and Defendant perceived him to be disabled.

68. Plaintiff was able to perform the essential functions of his position, with or without reasonable accommodation.

69. Thus, Plaintiff was a qualified individual with a disability.

70. Defendant fired Plaintiff because of his actual or perceived disability, and/or record of such a disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a).

71. Defendant's violations of the ADA were undertaken with malice or reckless disregard of Plaintiff's rights under the ADA.

72. As a direct and proximate result of Defendant's discharge of Plaintiff, he has suffered damages, including lost wages and benefits, emotional distress, humiliation, inconvenience, and like injuries.

## Count II
## ADA: Failure to Accommodate

73. Plaintiff incorporates the allegations of Paragraphs 1 through 71 as if fully restated.

74. Despite ostensibly granting an accommodation to Plaintiff, Defendant failed to provide reasonable accommodations to Mr. Frederick's disability by firing him, in violation of 42 U.S.C. § 12112(b)(5)(A).

75. Defendant fired Plaintiff based on the need to make a reasonable accommodation in the future, in violation of 42 U.S.C. § 12112(b)(5)(B).

76. Defendant's violations of the ADA were undertaken with malice or reckless disregard of Plaintiff's rights under the ADA.

77. As a direct and proximate result of Defendant's discharge of Plaintiff, he has suffered damages, including lost wages and benefits, emotional distress, humiliation, inconvenience, and like injuries.

## Count III
## ADA: Retaliation

78. Plaintiff incorporates the allegations of Paragraphs 1 through 77 as if fully restated.

79. Defendant fired Plaintiff in retaliation for his request for, and exercise of, the right to reasonable accommodation, in violation of 42 U.S.C. § 12203(b).

80. Defendant's violations of the ADA were undertaken with malice or reckless disregard of Plaintiff's rights under the ADA.

81. As a direct and proximate result of Defendant's discharge of Plaintiff, he has suffered damages, including lost wages and benefits, emotional distress, humiliation, inconvenience, and like injuries.

## Count IV
## Breach of Contract

82. Plaintiff incorporates the allegations of Paragraphs 1 through 81 as if fully restated.

83. When Defendant offered, and Plaintiff accepted, the payment of a $20,000 sign-on bonus, payable at $2,000 per month, the parties formed an oral contract.

84. The oral contract did not permit Defendant to "suspend" the sign-on bonus, nor did it require Plaintiff to remain employed for any particular period of time to receive it.

85. Nonetheless, Defendant only paid $14,000 of the $20,000 sign-on bonus during Mr. Frederick's employment.

86. As such, Defendant materially breached the contract to pay a $20,000 sign-on bonus.

87. As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages in the amount of $6,000.

## Count V
## Wage Payment and Collection Law

88. Plaintiff incorporates the allegations of Paragraphs 1 through 87 as if fully restated.

89. The $20,000 sign-on bonus agreed-upon at the start of Plaintiff's employment constitutes "wages" within the meaning of the Wage Payment and Collection Law ("WPCL"), 43 Pa. Stat. § 260.2a.

90. Defendant failed to pay $6,000 of the sign-on bonus within ten days of its due date, in violation of 43 Pa. Stat. § 260.3(b), or by the next regular payday, in violation of 43 Pa. Stat. §260.3(a).

91. Defendant's failure to pay the sign-on bonus is not based on a good faith dispute as to Plaintiff's entitlement to wages.

92. Therefore, pursuant to 43 Pa. Stat. § 260.10, Plaintiff is also entitled to liquidated damages equal to 25% of the total amount of wages due.

WHEREFORE, Plaintiff demands judgment against Defendant and requests that the Court order the following relief:

a. Defendant shall reinstate Plaintiff into the position he held, together with all benefits incident thereto, including, but not limited to wages, commissions, stock units, fringe benefits, training and seniority;

b. Defendant shall provide Plaintiff with front pay in the event reinstatement is not feasible;

c. Defendant shall compensate Plaintiff for the full value of wages he would have received had it not been for Defendant's illegal treatment of Plaintiff, with interest until the date Plaintiff is offered employment into a position substantially equivalent to the one which Plaintiff occupied, grossed up for negative tax consequences;

d. Defendant shall compensate Plaintiff for lost benefits, including profit sharing, stock options and/or pension benefits until Plaintiff's normal retirement date;

e. Plaintiff shall be awarded compensatory damages against Defendant to

      compensate him for emotional distress, humiliation, inconvenience, and like injuries;

f. Plaintiff shall be awarded punitive damages to punish Defendant and to deter Defendant and others from like conduct;

g. Defendant shall be enjoined from discriminating against Plaintiff in any manner that violates the ADA;

h. Defendant shall pay the remainder of the sign-on bonus payable to Plaintiff;

i. Defendant shall pay liquidated damages of 25% of the total unpaid sign-on bonus under Count V;

j. Plaintiff shall be awarded against Defendant the costs and expenses of this litigation and a reasonable attorney fee; and

k. Plaintiff shall be awarded prejudgment interest;

l. Plaintiff shall be granted such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

**ELZER LAW FIRM, LLC**

/s/ Christine T. Elzer
Christine T. Elzer
Pa. I.D. No. 208157
Mark A. Johnson
Pa. I.D. No. 308296

100 First Avenue, Suite 1010
Pittsburgh, PA 15222
(412) 230-836

Attorneys for Plaintiff